Filed 7/28/25  Hollingsworth v. Heavy Transport CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LEANNE HOLLINGSWORTH et al., | B316497 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Superior Ct. No. BC690999) |
| HEAVY TRANSPORT INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Affirmed.

Murray & Associates and Lawrence D. Murray for Plaintiffs and Appellants.

Gray • Duffy, John J. Duffy and Michelle A. MacDonald; Black, Compean & Hall, Frederick G. Hall and Richard C. Turner for Defendants and Respondents.

This is the third appeal arising out of the accidental death of Kirk Hollingsworth.[1]  Kirk, who worked as a maintenance supervisor for Heavy Transport, Inc. (HT), was changing a flat tire on a tractor-trailer when the driver moved the vehicle, fatally pinning Kirk underneath.  Kirk's wife and son, Leanne and Mark Hollingsworth, filed a wrongful death complaint against HT and related companies Bragg Investment Company, Inc. and Bragg Crane Service, Inc. (collectively, Bragg).  The jury found Bragg negligent, but determined that Kirk was 70 percent at fault for the accident and Bragg was 30 percent at fault.  The jury awarded $988,000 in damages to Leanne and $54,000 to Mark.  The court subsequently denied plaintiffs' motion for new trial.

On appeal, plaintiffs claim that the trial court erred in refusing to give their proposed special jury instructions on the standard of care as set forth in regulations promulgated by the California Occupational Safety and Health Administration (OSHA).[2]  They also seek reversal of several aspects of the jury's damages award.  Additionally, they contend that they were deprived of a fair trial due to the court's repeated displays of hostility toward plaintiffs' counsel.

Bragg filed a cross-appeal, arguing that the court should have granted its motion for summary judgment on the ground that it was not Kirk's employer and thus had no liability for the accident under *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*).  Bragg also contends the trial court erred in denying its motion for directed verdict on the same ground.

We find no error.  We therefore affirm the judgment.

---

[1]    We refer to members of the Hollingsworth family by first name for clarity.  No disrespect is intended.

[2]    OSHA refers both to the specific sections of the Labor Code constituting OSHA (Labor Code § 6300 et seq.) and to the regulations and safety orders promulgated under OSHA.

## FACTUAL AND PROCEDURAL HISTORY[3]

### I. *Complaint*

Plaintiffs filed their complaint in January 2018, alleging a single claim for wrongful death against HT and Bragg. The complaint alleged that Bragg purchased HT in 1986, but HT continued its business of transporting "heavy materials to the public" under the HT name.

Plaintiffs alleged that on June 20, 2016, Bragg retained HT to transport an 80-ton crane on a trailer owned and provided by Bragg. The vehicle at issue consisted of two parts—a three-axle truck, or tractor, with the cab for the driver, followed by a six-axle trailer holding the crane being transported. The trailer sustained three flat tires while carrying the crane. Kirk was called to replace the tires and did so successfully the first and second times. However, on the third occasion, the outer rubber tread of the tire wrapped around the axle of the trailer. Plaintiffs alleged that Kirk worked with the driver, HT employee Leroy Proctor, to drive the truck back and forth to free the axle. During these efforts, Proctor accidentally drove the trailer over Kirk, killing him. The complaint alleged that HT and Bragg were responsible for the accident by failing to provide proper training to their employees on safe roadside repair procedures, including immobilizing the tractor and trailer during all repair work.

Plaintiffs filed the operative first amended complaint in June 2020, adding two entity defendants, Bragg Crane Service Inc. and Bragg Contracting Co., Inc. Plaintiffs later dismissed Bragg Contracting Co., Inc. without prejudice.

### II. *Prior Appeals*

The first two appeals involved the parties' dispute over whether plaintiffs' claims were governed by workers' compensation insurance.

---

[3] The briefs filed by both parties identify citations to the record by page number only, in violation of California Rules of Court, rule 8.204(a)(1)(C). This rule requires briefs to "[s]upport any reference to a matter in the record by a citation to the *volume* and page number of the record where the matter appears." This rule violation is particularly onerous in a case with a substantial record like this one. We expect counsel will adhere to these rules in the future.

Defendants argued that HT was a fictitious business name for Bragg rather than a separate entity, and that the matter was subject to the exclusive jurisdiction of the Workers' Compensation Appeals Board (WCAB). In *Hollingsworth v. Superior Court* (2019) 37 Cal.App.5th 927, this court held that the superior court was the appropriate forum to determine which tribunal had exclusive jurisdiction over plaintiffs' claims.

On remand, the trial court held an evidentiary hearing and determined that HT was insured by a workers' compensation policy at the time of Kirk's death and that Kirk was employed by HT, not Bragg. Therefore, the WCAB had exclusive jurisdiction over the plaintiffs' claims against HT. The court entered judgment terminating proceedings in the superior court as to HT. This court affirmed that judgment on appeal in *Hollingsworth v. Heavy Transport, Inc.* (2021) 66 Cal.App.5th 1157, 1161.

III.    *Motion for Summary Judgment*

Bragg filed a motion for summary judgment in February 2021, asserting that liability was barred under *Privette* because it was not Kirk's employer. As discussed further below, the *Privette* doctrine "holds that a hirer generally delegates to an independent contractor all responsibility for workplace safety and is not liable for injuries sustained by the contractor or its workers while on the job." (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 40 (*Gonzalez*).) Bragg argued that it hired HT as an independent contractor to transport a crane and therefore Bragg was not liable for the fatal injuries to Kirk, HT's employee. Plaintiffs opposed the motion, contending that the case fell within an exception to *Privette* because Bragg retained control over all safety training for HT employees but failed to properly provide that training, resulting in Kirk's accident.

The court denied the motion following a hearing on June 29, 2021. The court found triable issues of fact as to the applicability of *Privette*, specifically whether Bragg owned the trailer involved in the accident.

IV.    *Trial Motions*

Prior to trial, the parties filed numerous motions in limine. As relevant here, Bragg sought to exclude evidence that it was required to provide certain training to HT employees pursuant to OSHA regulations. Conversely, plaintiffs sought to exclude Bragg from introducing evidence of any "lesser

4

safety standards," arguing that only OSHA standards applied. The court denied the motions, finding plaintiffs could argue that OSHA standards set Bragg's duty of care, but the jury was not required to make that finding.

Plaintiffs also submitted numerous proposed special jury instructions related to their argument that the OSHA regulations established the standard of care for Bragg's negligence. The court sustained Bragg's objections to these instructions. In a written ruling, the court found in large part that the authorities cited by plaintiffs did not support the proposed instructions.[4]

## V.     *Trial*

Trial began on August 17, 2021. Ultimately the trial proceeded with only 11 jurors, after one juror was dismissed and the alternate subsequently became ill. The parties stipulated to proceed and agreed that eight votes would be needed for a verdict in favor of either party.

### A.     *Evidence at Trial*

The parties adduced the following evidence at trial.

#### 1.     *Kirk's family*

Plaintiffs both testified about their loving relationship with Kirk. Mark, who was 32 years old at the time of trial, testified about the activities he would do with Kirk and their close father-son relationship. Leanne testified that she met Kirk while she was in high school. They married in 1998. She testified about their relationship, explaining that Kirk was her "rock" and her "person." She also described Kirk as a loving father and testified about how they would spend time with Mark as a family. Larry, Kirk's father, also described Kirk's relationship with his wife and family as affectionate and loving.

---

[4]     We discuss the trial court's rulings further below as related to plaintiffs' claims of error.

### 2.    *Proctor*[5]

Leroy Proctor testified that he had worked as a driver for HT for eight years and for other heavy hauling companies for more than 30 years.  Kirk was a mechanic and the shop foreman at HT.  Proctor explained that if there was a problem with a vehicle, the driver was supposed to contact Kirk and he would direct the driver what to do. It was Kirk's job to repair the equipment. Proctor testified that Kirk was good at his job and Proctor would follow his directions.  Kirk would also visually inspect the equipment, including the tires, before it left the yard.

On the day of the accident, Proctor was assigned to drive to Union City, pick up the body of the crane, and bring it back to the yard in Stockton.[6]  He had moved this type of crane previously more than a hundred times.  Proctor testified that this particular crane was no different than others he had moved, and the trailer was capable of carrying a crane of that weight. Proctor estimated that the crane was about 60 percent of the hauling capacity of the trailer.[7]

The morning of June 20, Proctor did the usual vehicle inspection, including "bumping" the tires to check for air.  He did not note any issues during the inspection.  After he picked up the crane and began the drive back to the yard, he noticed around 1:00 p.m. that one of the trailer's tires was flat.

When Proctor realized that the tire had "delaminated"—the tread had come off the tire—he pulled to the side of the road and set the air brakes.  He explained that after he set the brakes, a trailer would not move until he intentionally released the brakes.  Proctor then called the maintenance shop, as he had been directed by the branch manager to do when there was a flat tire.  Kirk arrived, used a hydraulic jack to lift the trailer, removed the flat

---

[5]    Both parties presented testimony from Proctor (the driver) and three Bragg employees, Gregory Sabin, Michael Riggs, and Conrad Weidenkeller. For these witnesses, plaintiffs played excerpts of their depositions during their case in chief.  Bragg then called them as live witnesses during the defense case.

[6]    The Stockton yard was shared by HT and Bragg Crane Service.

[7]    HT was the registered owner of the trailer.  HT had been hired to transport the crane for Bragg Crane Service, Inc.

tire, and put on a new tire.  Proctor had seen Kirk follow this process on other occasions. It took about 30 minutes.  Proctor assisted, but Kirk did the work of actually changing the tire.

A few hours later, a second tire delaminated and Proctor saw pieces of rubber fly onto the freeway. He pulled over and followed the same routine. This time, Kirk seemed a little upset and said that "those were the oldest tires on the trailer," he "didn't have the new ones in yet," and he "thought they would last longer."  Kirk changed the tire in the same manner as before. Proctor noted that all three flat tires that day occurred on axle seven (of nine) of the trailer.  Counting from the outside of the driver's side (tire one) and moving toward the passenger side (ending in tire eight), the first flat was tire number four, the second flat was tire number one, and the third flat was tire number six.

The third delamination happened around 5:30 p.m., less than ten miles from the yard in Stockton.  It was harder to pull the vehicle over this time because the shoulder on the road was narrow.  Proctor parked and set the brakes.  When Kirk arrived, he did not jack up the trailer as he had the past two times. Instead, he took some pry bars from his truck and he and Proctor tried to "pry the piece of rubber out of the brake drum and the brake working the trailer."  Proctor stated that he had never used this method before, and it was not successful.  They then discussed what to do to remove the rubber that remained wrapped around the axle and decided to move the truck. Proctor asked, "what do you want [me] to do?" Kirk told him to move the truck forward, hoping the rubber would release.

Proctor got into the truck cab, waited until he saw a hand signal from Kirk visible in his side mirror, and then pulled the trailer forward.  He pulled forward about eight to ten feet, then got a hand signal from Kirk to stop. Proctor got out and they tried again to pry the rubber out.  When that was unsuccessful, Kirk told him to back up the truck.  He made sure he could see Kirk as the "spotter" in the mirror, released the brake, and then watched the mirror as he backed up.  When Kirk signaled to stop, he stopped, got out, and they tried the pry bars again.  Kirk then told him to pull forward again. Proctor waited for the hand signal from Kirk to move, released the brakes, let the clutch out, and started to roll the truck forward.  He reiterated that he

did not start to move the truck until getting the signal from Kirk, because "you never move without getting a signal from your spotter."

Proctor explained that when driving forward, he would check his side mirror to see the spotter, but he also needed to glance forward to the road to make sure there was nothing in front of him. In this instance, he looked ahead as he started to move the truck forward, then glanced back at the side mirror and could not see Kirk. As soon as he realized he could no longer see Kirk in the mirror, Proctor stopped the truck, set the brakes, and got out.

Proctor found Kirk sitting on the ground facing toward the back of the vehicle, straddling tire number seven and with the tire pinning his right leg. Kirk was wedged between the tire against his stomach and a protruding part of the trailer's suspension against his back. He was unconscious and gasping for air. According to Proctor, Kirk had been pulled down into that position. Proctor realized he could not safely move the truck without further injuring Kirk, so he ran to a nearby house and told a man standing in his yard to call 911. He then went back to Kirk and tried to help him breathe until paramedics arrived.[8]

Proctor acknowledged that during his time at HT, he was never trained on how to properly do roadside repairs. When he started at HT, he completed a safety orientation but did not have to complete any training. Proctor had a safety meeting with a Bragg supervisor, Michael Riggs, and they reviewed personal protective equipment and what to do in case of an accident. He did not recall going over any documents. In response to questions about training, Proctor stated that he did not recall anyone at HT ever telling him not to repair or adjust machinery while in operation or not to work on machinery until it was locked out and tagged out. Proctor stated that "[w]e don't do lockout and tag-out in this industry." He noted that he had never been trained in lockout and tag-out as a driver. He received some instruction on that protocol when working on location at the industrial plants of some of Bragg's customers, as it related to machinery at those plants, but Proctor did not believe the protocol applied to the drivers. No one at HT or Bragg ever

---

[8]     The parties stipulated that Kirk's death was caused by asphyxia and blunt force trauma from the accident.

told him it was the practice of the company that no employee should work on equipment while it was in operation.

Proctor testified that he attended formal safety meetings about twice a year conducted by Gregory Lorin Sabin, the branch manager and a Bragg employee. The employees would also get safety bulletins from Bragg in their box or handed to them. He would look at the bulletins to see if the topic was relevant to his work but would not necessarily read them. He kept all the paperwork in his truck.

### 3. *Bragg Employees*
#### a. *Weidenkeller*

The parties offered testimony from Conrad Weidenkeller, the Bragg corporate safety director. He explained that he worked for Bragg Management Company, which functioned as the "support division" for all of the companies under the Bragg umbrella. The managers in each division were employees of Bragg Management Company, while the hourly employees were employed by each specific division, such as HT. HT operated as a specialty division under the Bragg umbrella, specializing in the "transportation of over-dimension loads."[9]

Weidenkeller was responsible for administering the safety program for all Bragg companies, including HT. He also developed the Bragg health and safety manual. His department included division safety managers for each division. He did not have experience with transportation, so he relied on the division safety manager, Michael Riggs, for the safety requirements and regulations specific to HT.

Weidenkeller sent out weekly safety bulletins company-wide. He acknowledged there was no evidence to show that the bulletins were actually discussed in training or used. Weidenkeller agreed that OSHA required Bragg to conduct a safety meeting every week, so he would send safety bulletins as "an informational bulletin to assist the branch managers and supervisors across the organization in facilitating that requirement." Each division, including HT, decided what training was needed for that division.

---

[9] The parties have argued alternating positions throughout this litigation regarding whether Bragg and HT were separate entities. However, the witnesses at trial consistently described HT as a division of Bragg.

He deferred to the safety manager (Riggs) and the branch manager to design the safety program for the HT drivers, and he trusted the branch manager to conduct the weekly safety meetings. Weidenkeller testified that he, along with every supervisor and manager at Bragg, was responsible for providing the highest degree of safety for employees in the Bragg organization.

### b. *Sabin*

Gregory Lorin Sabin was employed by Bragg as a branch manager at the Stockton branch of HT. Sabin was responsible for training the drivers, and he worked with manager Riggs on safety training for his branch. Kirk was the maintenance supervisor; it was his job to make sure the equipment was safe and operational.

Sabin started working with Kirk at another company in 2000 and stated that Kirk was one of the best mechanics he had ever worked with. Sabin considered Kirk to be his best friend. Kirk performed a maintenance check, including checking the tires, on the trailer at issue about two weeks before the accident, as reflected on his maintenance sheet. At the time of the accident, Kirk was in the process of replacing the trailer's tires with newer ones. He had already replaced the tires on all of the trailer's axles except axle seven.

Sabin testified that Kirk followed protocol to change the first two tires on the day of the accident, by using a jack to elevate the vehicle and then changing the tire. The third time, however, the method of moving the truck back and forth was "not company policy nor was it within our safety standards." Sabin acknowledged that there was no written policy or procedure stating that the correct method was to elevate the trailer using a jack.

Sabin confirmed that HT used Bragg's safety department. When Sabin received a safety bulletin from Bragg, he would review it and if it applied to the transportation division, he would put a copy in each driver's inbox. Sabin also received bulletins from Riggs, most of which dealt with transportation compliance issues, and he disseminated those to the drivers as well.

Sabin testified that he attempted to hold a formal safety meeting once per quarter. He also held informal meetings at the beginning of each job. As the maintenance supervisor, Kirk would address the drivers and shop staff at

meetings about anything involving the maintenance department.  It was also Kirk's role to train the mechanics.

According to Sabin, the lockout/tag out protocol is not used in the transportation department.  As such, he never received any training on that protocol and does not train the drivers with it.  Sabin also testified that red-tagging, which is the process of marking a vehicle that must not be used, is used in the shop but not in roadside repairs.

### c.  *Riggs*

Michael Riggs testified that he has worked for Bragg Management Company since 2007.  He began his employment as the safety supervisor for HT and in mid-2016 he became Bragg's Department of Transportation (DOT) compliance manager.  Riggs handled compliance with federal and state motor carrier regulations.  Riggs confirmed that Bragg handled the safety training for HT.

Riggs testified that the term lockout/tag out was not used in the trucking industry.  None of the transportation companies he worked for did training on lockout/tag out.  He explained that HT drivers received a one-on-one orientation, including general guidelines for safe practices.  Every new employee received a copy of Bragg's Illness and Injury Prevention Plan (IIPP) and was told to read and understand it.  In addition, Riggs would sometimes hold informal "tailgate meetings" to review specific issues such as the protocol for a job or regulatory changes.  On occasion, Riggs would also issue a safety bulletin on a particular topic and send that to Sabin to deliver to the drivers.  As branch manager, Sabin was in charge of the formal training process at HT's Stockton branch.  If a driver noticed a problem with equipment, the driver would note it on the daily vehicle inspection report and then the shop would determine if the vehicle needed to be red-tagged and placed out of service.

Riggs testified that it was protocol that whenever a driver was backing up a truck, he or she must use a second person as a "spotter."  The spotter must stay in the driver's view through the mirror at all times; if the driver loses sight of the spotter, then "all movement stops."  For the spotter, the policy is "don't put your body anywhere near moving equipment."  Riggs admitted he was not sure if these rules were part of the safety program or

just "common sense."  Riggs agreed that OSHA regulations apply to all companies, including HT, but that was not his area of expertise.  At the time of the accident, Riggs was not aware of any protocol for lockout/tag out for commercial vehicles or any protocol or training regarding roadside repairs.

### 4.    *Plaintiffs' experts*

Plaintiffs presented expert testimony from Chris Kauderer, a traffic accident reconstructionist  Based on his review of the case materials and Proctor's description of the accident, Kauderer opined that after the truck had moved forward once and backward once, Kirk intentionally put himself into the seated position on the ground, facing the back of the trailer, with his legs straddling the tires.  He rejected Proctor's claim that he saw Kirk disappear from view in his sideview mirror and then immediately stopped the trailer.  Instead, Kauderer concluded that it would have taken Kirk longer than a few seconds to get into the seated position straddling the wheels, where he was found.  Kauderer opined that Kirk was already seated on the ground when the trailer started moving forward the final time.  He explained that this sequence of events was consistent with the injuries Kirk sustained to his leg; by contrast, if Kirk had caught his foot and been pulled into the wheels as Proctor suggested, he would likely have sustained injuries to his foot.  Kauderer believed the accident resulted from a miscommunication and that both Proctor and Kirk bore responsibility.

Plaintiffs also presented testimony from Wade Obermann, a safety expert.[10]  He opined that Bragg's written safety materials met the industry standard, but he was "surprised" that the Bragg managers (Sabin, Riggs, and Weidenkeller) did not know about safety protocols including lockout/tag out and did not feel that these protocols applied to them.  Obermann noted that the Bragg witnesses had used other terminology instead of lockout/tag out, like "make safe" and "safe off."  But he testified that "it doesn't matter what you called it. . . .  They just weren't doing it. They didn't think it applied to them." Regardless of the terminology, he stated that he did not see any evidence that HT employees received training "in lockout and tag out or red-

---

[10]     Plaintiffs also presented a second safety expert, Leslie Smart.  However, due to issues with his cross-examination, his testimony was stricken by the court.

tagging or safe and lock or making safe equipment before they worked on them."

Obermann reviewed several safety flyers issued by Bragg prior to the accident, which cautioned workers that many accidents were caused by moving vehicles in industrial workplaces and reminded them to use lock out/tag out procedures when performing repairs or preventative maintenance. He testified that this protocol was consistent with industry standards to prevent injury while repairing machinery, including trucks or trailers. However, he did not see evidence that Bragg actually trained its workers on these procedures.

Obermann also pointed to Bragg's IIPP, which included lockout/tag out and other protocols for immobilizing equipment before working on it. Obermann opined that these written materials were adequate, and Bragg should have provided training on these safety procedures to its workers. He testified that the only evidence of training by Bragg was that it provided new employees with written materials at orientation, but Bragg did not confirm whether the employees had read or understood the information. He did not consider that adequate training. Instead, Obermann opined that adequate training should include regular discussions with employees so that management sets an expectation that the procedures are important and should be followed.

Obermann also testified about the lockout/tag out requirements under OSHA. He considered these standards an important part of a safety program. Obermann concluded that he would grade Bragg's written safety materials as a B-plus or an A, but would give Bragg's implementation of safety protocols an F.

During cross-examination, Obermann agreed that the method Kirk and Proctor used to change the first two tires—jacking up the trailer and replacing the tire—was appropriate. He testified that they should have used the same procedure the third time. Instead, they took a shortcut by moving the trailer back and forth to try to free the tire shreds from the axle. Obermann testified that this was a "bad plan." He also testified that "[t]hey might have made a better [choice] if they had better training." He opined that as the maintenance supervisor present, Kirk should have performed a

13

lockout/tag out on the trailer so that it could not be operated until it had been repaired. But he explained that there was no evidence that either Kirk or Proctor had been trained to use the lockout/tag out protocol, so he would not blame them for choosing the shortcut. He emphasized the importance of regular training to help employees build a habit of performing tasks safely and reducing the likelihood an employee will choose an unsafe alternative.

Economist Phillip Allman also testified on behalf of plaintiffs. He detailed his calculation of plaintiffs' damages, including approximately $1.4 million past and future economic losses suffered by Leanne.

## B. *Bragg's Motion for Directed Verdict*

At the close of evidence at trial, Bragg moved for a directed verdict. Bragg argued that the applicable exception to *Privette* required "an act or omission coupled with a promise" and that plaintiffs had not presented any evidence of a promise by Bragg to conduct safety training, beyond an "implicit agreement." The court queried, "how can you look at the relationship between Bragg and [HT] and conclude anything other than that Bragg was going to do 100 percent of the safety training?" Bragg's counsel responded that the evidence at trial showed Bragg sent out safety bulletins, a passive activity, but HT did the "active training." She also argued that there was no evidence that Bragg interfered with the completion of the task (moving the crane) for which it had hired HT.

Plaintiffs argued that Bragg had retained control over all safety training and failed to train Proctor and Kirk as to the proper protocol for changing tires, including requiring immobilization of the truck. The court agreed that there was sufficient evidence from which the jury could conclude that Bragg had promised to provide safety training to the drivers and failed to do so. The court accordingly denied the motion for directed verdict.

## C. *Verdict*

The jury returned a verdict on August 26, 2021. In response to the questions on the special verdict form, the jury found the following: (1) Bragg controlled the site of the accident and retained control over safety conditions at the site; (2) Bragg negligently exercised that retained control by failing to provide proper training to Proctor and/or Kirk; (3) plaintiffs were harmed; (4) Bragg's negligent exercise of retained control over safety conditions was a

14

substantial factor in plaintiffs' harm; (5) Kirk was negligent; (6) Kirk's negligence was a substantial factor in his harm; and (7) Kirk was 70 percent at fault, while Bragg was 30 percent at fault.

The jury awarded Leanne past economic damages of $301,000, future economic damages of $552,000, and $135,000 for loss of companionship. The jury awarded Mark past economic damages of $5,000, future economic damages of $22,000, and $27,000 for loss of companionship.

## VI.  *Plaintiffs' Motion for New Trial*

Plaintiffs filed a motion for new trial, arguing that the court erred in rejecting their proposed special jury instructions on OSHA standards.  They also contended that the jury's damages award was not supported by the evidence and that the court's "expressions of disbelief, hostility, and derogatory gestures" during trial had unfairly affected their presentation.

The court heard argument on the motion on October 28, 2021.  In its written order denying the motion, the court explained that it had excluded plaintiffs' proposed special instructions because they did not adequately reflect the relevant Labor Code or OSHA standards.  Additionally, the court rejected plaintiffs' challenge to the damages awarded, finding that the jury did not have to base its award on the testimony by plaintiffs' expert. Further, the court found it properly excluded evidence of plaintiffs' grief and sorrow as not recoverable in a wrongful death action.  Finally, the court rejected plaintiffs' contentions regarding "derogatory" conduct by the court.  We discuss the court's ruling further below.

Plaintiffs appealed from the judgment after the jury verdict.  Bragg cross-appealed from the orders denying its motions for summary judgment and directed verdict.

## DISCUSSION

## I.  *Bragg's Cross-Appeal*

Bragg cross-appeals from the orders denying its motions for summary judgment and directed verdict, arguing that the *Privette* doctrine barred Bragg's liability for the accident as a matter of law.  We decline to review Bragg's challenge to the denial of its summary judgment motion on appeal. As for the merits of Bragg's motion for directed verdict, we find no error in

the trial court's conclusion that the applicability of *Privette* was a matter for the jury to decide.

## A.    Appealability

As an initial matter, we address whether Bragg may appeal from the orders at issue. Code of Civil Procedure section 904.1[11] sets forth the judgments and orders from which an appeal may be taken. An order denying a motion for summary judgment is not an appealable order under section 904.1. (See also *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 343 (*Federal Deposit*), citing *Lackner v. LaCroix* (1979) 25 Cal.3d 747, 753; see also *Sierra Craft, Inc. v. Magnum Enterprises, Inc.* (1998) 64 Cal.App.4th 1252, 1256 [concluding, pursuant to section 437c, subdivision (m)(1), that the denial of summary judgment "may only be reviewed by way of a petition for extraordinary writ"].)  Bragg concedes that an order denying a motion for summary judgment is generally not appealable.

However, that order is an interlocutory order that may be reviewed on direct appeal from a final judgment entered after a trial. (§ 906 ["Upon . . . appeal . . . the reviewing court may review . . . any intermediate ruling ... which involves the merits or . . . which substantially affects the rights of a party. . . ."]; see also *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 948; *Federal Deposit, supra,* 167 Cal.App.4th at p. 343.)[12] Although we may review the order denying summary judgment, "the appellant must nevertheless show the purported error constituted prejudicial, or reversible, error (i.e., caused a miscarriage of justice)." (*Federal Deposit, supra,* 167 Cal.App.4th at p. 343.)

Bragg has not demonstrated prejudicial error here.  In particular, "erroneous denial of summary judgment is generally harmless error after a

---

[11]    All undesignated statutory references are to the Code of Civil Procedure.

[12]    We note that Bragg does not cite section 906 or make any showing how it meets the requirements of that statute.  Instead, Bragg cites *Gackstetter v. Frawley* (2006) 135 Cal.App.4th 1257, 1269, for the proposition that some courts have allowed review of a denial of summary judgment in exceptional cases.  In *Gackstetter*, the defendant's summary judgment motion challenged a good faith settlement reached in a different action. (*Id.* at p. 1270.)  Bragg demonstrates no such exceptional circumstances here.

full trial covering the same issues.  [Citation].” (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1010–1011; see also *Gackstetter v. Frawley, supra,* 135 Cal.App.4th at p. 1269 [“‘A decision based on less evidence (i.e., the evidence presented on the summary judgment motion) should not prevail over a decision based on more evidence (i.e., the evidence presented at trial).’ [Citation.]”].)  We therefore decline to review the denial of Bragg’s motion for summary judgement.

The order denying Bragg’s motion for directed verdict is also not an appealable order under section 904.1.  Bragg’s contention that the order is appealable under that statute is therefore meritless.  But we may review the denial order in an appeal from a final judgment pursuant to section 906, where the order “involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party.”

Here, the issue raised in Bragg’s motion for directed verdict was whether plaintiffs’ evidence at trial was insufficient to permit a jury to find in its favor that an exception to *Privette* applied.  Resolution of this issue substantially affected Bragg’s rights as it determined whether Bragg was exempt from liability as a matter of law. Accordingly, we will proceed to examine the merits of Bragg’s cross-appeal with respect to the denial of the motion for directed verdict.

## B.    Review of Directed Verdict

A defendant is entitled to a nonsuit or directed verdict “if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. ‘In determining whether plaintiff’s evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give “to the plaintiff[’s] evidence all the value to which it is legally entitled, ... indulging every legitimate inference which may be drawn from the evidence in plaintiff’[s] favor.”’ [Citation.]” (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*); see also *Joyce v. Ford Motor Co.* (2011) 198 Cal.App.4th 1478, 1488.)

We review the denial of a motion for directed verdict de novo, applying the same standards as the trial court. (*Nally, supra*, 47 Cal.3d at p. 291;

17

*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1060.) "Reversal is only proper when no substantial evidence exists tending to prove each element of the plaintiff's case." (*Wright v. Beverly Fabrics, Inc.* (2002) 95 Cal.App.4th 346, 351.)

### C. *Privette*

The *Privette* doctrine sets forth the presumption that "[a] person or entity hiring an independent contractor (a 'hirer') ordinarily delegates to that independent contractor all responsibility for the safety of the contractor's workers." (*Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 264 (*Sandoval*), citing *SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 597.) The doctrine is "grounded in two major principles: first, that independent contractors by definition ordinarily control the manner of their own work; and second, that hirers typically hire independent contractors precisely for their greater ability to perform the contracted work safely and successfully." (*Sandoval, supra*, 12 Cal.5th at p. 269.) The court has also found this doctrine promotes workplace safety through "clear rules about who's responsible for avoiding harms to workers when contractors are hired." (*Id*. at p. 264.) Accordingly, there is a "'strong policy' of presuming that a hirer delegates all control over the contracted work, and with it all concomitant tort duties, by entrusting work to a contractor." (*Id*. at p. 270.)

But there are exceptions to this presumption. As relevant here, "a hirer may be liable when it retains control over any part of the independent contractor's work and negligently exercises that retained control in a manner that affirmatively contributes to the worker's injury." (*Gonzalez, supra*, 12 Cal. 5th at p. 38, discussing *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 202 (*Hooker*).) This exception includes "three key concepts: retained control, actual exercise, and affirmative contribution." (*Sandoval, supra*, 12 Cal.5th at p. 274.)

First, "[a] hirer 'retains control' where it retains a sufficient degree of authority over the manner of performance of the work entrusted to the contractor." (*Sandoval, supra*, 12 Cal.5th at p. 274.) In other words, "a hirer who retains control over any part of that work owes others a duty of reasonable care respecting the hirer's exercise of that retained control." (*Ibid*.) Further, "a hirer's authority over the contracted work amounts to

retained control only if the hirer's exercise of that authority would sufficiently limit the contractor's freedom to perform the contracted work in the contractor's own manner. [Citation.]" (*Id.* at p. 275.)

Second, a hirer "'actually exercise[s]' its retained control over the contracted work when it involves itself in the contracted work 'such that the contractor is not entirely free to do the work in the contractor's own manner.'" (*Sandoval, supra*, 12 Cal.5th at p. 276.) "Unlike 'retained control,' which is satisfied where the hirer retains merely the *right* to become so involved, 'actual exercise' requires that the hirer in fact involve itself" (*ibid.*), "such as by directing the manner or methods in which the contractor performs the work; interfering with the contractor's decisions regarding the appropriate safety measures to adopt; requesting the contractor to use the hirer's own defective equipment in performing the work; contractually prohibiting the contractor from implementing a necessary safety precaution; or reneging on a promise to remedy a known hazard." (*Gonzalez, supra*, 12 Cal.5th at p. 47; see also *Hooker, supra*, 27 Cal.4th at p. 209.)

Third, "'[a]ffirmative contribution' means that the hirer's exercise of retained control contributes to the injury in a way that isn't merely derivative of the contractor's contribution to the injury." (*Sandoval, supra*, at p. 277.) A hirer's conduct satisfies the affirmative contribution requirement when "the hirer in some respect induced—not just failed to prevent—the contractor's injury-causing conduct." (*Ibid.*) "A hirer's conduct also satisfies the affirmative contribution requirement where the hirer's exercise of retained control contributes to the injury independently of the contractor's contribution (if any) to the injury." (*Ibid.*) As such, "affirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Hooker, supra*, 27 Cal.4th at p. 212, fn. 3.) "Importantly, neither 'actual exercise' nor 'affirmative contribution' requires that the hirer's negligence (if any) consist of an affirmative act. The hirer's negligence may take the form of any act, course of

conduct, or failure to take a reasonable precaution that is within the scope of its duty under *Hooker*. [Citations.]" (*Sandoval, supra*, at p. 277.)

As summarized in *Sandoval*, "[a] hirer's mere authority to prevent or correct a contractor's unsafe practices (retained control) does not, without more, limit the contractor's delegated control over the work. But to the extent that the hirer exerts influence over the contracted work such that the contractor is not entirely free to perform the work in the contractor's own manner (actual exercise), the hirer does limit the contractor's delegated control. Still, we impose a duty only where that limitation itself contributed to the worker's injury (affirmative contribution), rather than where that limitation incidentally created an opportunity for the hirer to prevent the contractor's injury-causing conduct." (*Sandoval, supra*, 12 Cal.5th at p. 278.)

### D.    Analysis

Under *Hooker*, whether Bragg owed a duty of care to Kirk turns on whether it retained control over his performance of the contracted-for work and exercised that control in a way that affirmatively contributed to Kirk's injuries.  In the context of Bragg's motion for directed verdict, the trial court determined that Bragg had not established that plaintiffs' evidence was insufficient to permit a jury to find these elements in plaintiffs' favor.  We agree with the trial court.

Although HT was legally operating as an independent contractor, the evidence at trial was essentially undisputed that, for all practical purposes, HT was managed and run as a division of Bragg. Indeed, Bragg admitted that it "considered HT as a unit within Bragg" at the time of the accident and up until this court's ruling regarding worker's compensation in 2020.  Bragg's safety department controlled the development and distribution of all safety information for the companies under the Bragg umbrella, including HT.  In addition, Riggs and Sabin, both Bragg employees, were responsible for planning and conducting all safety training for HT employees.  Proctor testified that he was instructed by Sabin as to the protocol to follow if he sustained a flat tire (calling Kirk) and in the use of a spotter when moving the truck.  As such, the evidence was sufficient for the jury to find that Bragg retained control over the exercise of the work done by HT employees.  (See *Hooker, supra*, 27 Cal.4th at pp. 202, 215 [finding triable issue of retained

control where hirer's manual required it to ensure compliance with safety laws and regulations, required visits by a construction safety coordinator, and authorized hirer to shut down work to correct dangerous conditions].)

There was also sufficient evidence to allow the jury to find that Bragg exercised its retained control in a manner that affirmatively contributed to Kirk's injury. Bragg contends that the evidence showed, at most, that it passively permitted an unsafe condition, which does not meet the requirements of the *Hooker* exception. It points to several cases it claims are factually analogous to this one. In *Hooker*, for example, the decedent was a crane operator, employed by a contractor hired by the California Department of Transportation (Caltrans) to construct an overpass. (*Hooker, supra*, 27 Cal.4th at p. 202.) Hooker was killed after he retracted the crane's outriggers to allow other vehicles to pass on the overpass and the crane became unstable and tipped over. (*Ibid*.) The Supreme Court found that Caltrans did not affirmatively contribute to the accident because it *permitted* vehicles to use the overpass while the crane was being operated but did not *direct* the crane operator to retract the crane to allow the movement of traffic. (*Id*. at pp. 202, 214–215.) Instead, "[t]here was, at most, evidence that Caltrans's safety personnel were aware of an unsafe practice and failed to exercise the authority they retained to correct it." (*Ibid*.)

In *Horne v. Ahern Rentals, Inc*. (2020) 50 Cal.App.5th 192, the appellate court affirmed the grant of summary judgment for the hirer. The decedent tire technician was employed by a company providing tire repair and replacement services to the hirer defendant. He was killed when the defendant's forklift collapsed on him while he was changing a tire. (*Id*. at p. 195.) The plaintiffs argued that the defendant retained control over the safety conditions of the forklift by initially parking the forklift in an unstable manner with the boom raised and because only the defendant was lawfully permitted to operate the forklift. (*Id*. at p. 201.) The court found that evidence insufficient to establish affirmative contribution. The court noted that there was no evidence the defendant agreed to implement any particular safety measures and that the defendant did not train the tire service employees on how to service the forklift. (*Id*. at p. 203.) In addition, the manager of the tire service company was supervising the work and he "was

21

the one who made the decision that the location of the forklift was appropriate for him [the decedent technician] to do the work." (*Ibid*.) Thus, the court concluded that, "[a]t most, plaintiffs' evidence shows defendant passively permitted an unsafe condition." (*Ibid*.)

Finally, in *Sandoval, supra*, 12 Cal.5th at p. 265, an electrical worker was seriously burned while working on electrical equipment owned and operated by the defendant hirer. The Supreme Court found insufficient evidence that the hirer affirmatively contributed to the accident. The hirer held a safety briefing on the day of the incident, including warning that some circuits would remain live, and then performed the "power-down" process designed to ensure there was no live electricity in the main cubicle that the subcontractor was inspecting. The hirer's employees then left the premises after confirming with the subcontractor that it was satisfied with the power-down and understood which circuits were dead. (*Id*. at pp. 266-267.) The subcontractor, plaintiff's employer, then instructed another employee to remove the protective panel from a nearby cubicle with a live circuit. The plaintiff was injured when metal he was holding triggered an arc flash from the live cubicle. (*Id*. at p. 267.) In applying *Hooker*, the Supreme Court found that "substantial evidence does not support the conclusion that [the hirer] both retained control over some part of [the subcontractor's] work and actually exercised that control in a manner that affirmatively contributed to Sandoval's injury." (*Id*. at p. 279.) The *Sandoval* court explained that, even if the hirer retained control by retaining the authority to require or provide safety precautions, it did not actually exercise that authority, as the subcontractor was free to "implement (or not) any of these precautions in its own manner." (*Id*. at p. 281.)

We find these cases factually distinguishable. In *Horne* and *Sandoval*, for instance, even if the hirer retained some control over the work, there was evidence that the contractor had assumed that authority at the time of the accident and was free to "implement (or not)" its own safety precautions. Here, given the relationship between Bragg and HT, the jury could conclude that there were no HT managers who could make decisions about proper safety protocol. The only supervisors and managers were Bragg employees, who conducted all of the safety training and determined proper safety

protocol for HT employees to follow. Moreover, unlike the cases in which the hirer retained authority over safety but took no affirmative steps in that regard, here there was evidence that Bragg affirmatively undertook that training. Weidenkeller acknowledged that Bragg was required to hold weekly safety meetings and that he sent out weekly bulletins to support that training. Bragg's written safety materials included lockout/tag out protocols for some divisions. But there was evidence that the Bragg employees in charge of Kirk's branch did not hold weekly safety meetings and never instructed the HT employees on the proper procedure for changing a truck tire, or that in order to safely change the tire the truck must be immobilized.

Construing plaintiffs' evidence liberally, as we must, a jury could find that Bragg assumed the obligation of establishing all safety protocols and conducting all of the safety training for HT employees, and knew that immobilization of a vehicle was required in order to safely work on a flat tire. A jury could further find that HT was not "entirely free to perform the work in the contractor's own manner (actual exercise)" (*Sandoval, supra*, 12 Cal.5th at p. 278) and that Bragg negligently failed to provide the safety training it had promised to undertake (affirmative contribution) (*Hooker, supra*, 27 Cal.4th at p. 212, fn. 3). Unlike the typical independent contractor situation outlined in *Privette* and its progeny, there was substantial evidence that Bragg did not delegate its responsibility for safety to HT, nor was HT free to control the manner of its work. Under these circumstances, we conclude the evidence could establish that Bragg's conduct affirmatively contributed to Kirk's accident.

Plaintiffs also claim Bragg could be liable under a second *Privette* exception, as described in *McKown v. Wal-Mart Stores, Inc*. (2002) 27 Cal.4th 219 (*McKown*). There, the court held that a hirer of an independent contractor may be liable for providing unsafe equipment that affirmatively contributes to the injury of an employee of the contractor. ( *Id*. at p. 225.) We agree with Bragg that this exception is inapplicable here. Plaintiffs contend that the equipment was unsafe because the crane Proctor was hauling was too heavy for the trailer and the tires on axle seven were "defective," both of which led to the tire delamination and ultimately resulted in the accident. But unlike in *McKown*, in which the hirer had furnished a defective forklift

23

that resulted in the plaintiff's injury (see *McKown, supra*, 27 Cal.4th at p. 223), here, Kirk's fatal injuries were not directly caused by the tire failures. Indeed, the trailer's flat tires were the problem Kirk was employed to fix. Although plaintiffs argue that the quality of the tires led to more failures than usual, there was no evidence to suggest that an increased number of flat tires on this particular trailer had any causal link to the accident. Instead, plaintiffs claimed that the accident was caused by the method Kirk and Proctor employed in attempting to change the third flat and by Bragg's failure to train them how to do it safely.

We therefore conclude that the trial court did not err in denying Bragg's motion for directed verdict and allowing the jury to determine the applicability of *Privette*.[13]

## II. *Plaintiffs' Appeal*

Plaintiffs assert multiple grounds of error on appeal, all of which they also raised in their unsuccessful motion for new trial. Their primary claim is that the trial court erred in denying their proposed jury instructions defining a duty of care for Bragg under OSHA regulations. They also contend that the jury's award of a lesser amount of damages than that established by plaintiffs' expert was unsupported by the evidence. Additionally, they challenge the court's exclusion of evidence relevant to plaintiffs' "loss of love, society, and affection" after Kirk's death. Finally, plaintiffs argue that the court should have granted their motion for new trial based on the judge's body language, comments, and demeanor during trial. We find no error and affirm.

### A. Legal Standards

The court may grant a new trial based only on the specific grounds set forth in section 657. In all instances, the asserted grounds must have "materially affect[ed] the substantial rights of" the aggrieved party. (§ 657.) The standard for determining whether a party's substantial rights have been materially affected warranting a new trial is the same as the standard for determining prejudice generally, which requires a reasonable probability that a result more favorable to the moving party would have been obtained in the

---

[13] We do not reach plaintiffs' alternate argument that Bragg could be liable for owing a nondelegable duty as an employer under OSHA.

absence of the alleged error. (*TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1063.)

In ruling on a motion for new trial, the trial judge sits as a "'thirteenth juror'" and "'independently assess[es] the evidence supporting the verdict.'" (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503.) We review the order denying a new trial for abuse of discretion "by examining the entire record and making an independent assessment" of the grounds for denying the motion. (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832; see also *David v. Hernandez* (2014) 226 Cal.App.4th 578, 588-589.) As our Supreme Court explained it, "[A] trial judge is accorded a wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal. However, . . .[i]n our review of [an] order denying a new trial, as distinguished from an order granting a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial. [Citations.]" (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872.)

## B. Exclusion of Jury Instructions on OSHA

Plaintiffs contend that Bragg's duty of care was defined by relevant OSHA regulations. To that end, plaintiffs proposed 19 special jury instructions regarding the standard of care under OSHA, as well as two form instructions regarding negligence per se. Plaintiffs also filed a motion in limine to preclude Bragg from introducing evidence of lesser safety standards than OSHA. The court denied these requests. Plaintiffs thus argue that the jury was not instructed as to the appropriate duty of care and that a more favorable result—an apportionment of fault more favorable to plaintiffs— would have been likely absent the error. We conclude that plaintiffs have failed to establish error and, moreover, that any error was not prejudicial.

### 1. *Factual background*

Prior to trial, both parties filed numerous motions in limine to exclude evidence. As relevant here, plaintiffs' motion in limine number 2 sought to exclude all evidence or argument "suggesting any variation in or other authorized procedure than those required by California OSHA regulations and Federal OSHA regulations." Conversely, Bragg filed motion in limine

number 1 to preclude evidence of any training by Bragg, arguing that Bragg was not the employer and therefore had no duty to train any HT employees. Bragg also filed motion in limine number 2 to exclude testimony of plaintiffs' expert Obermann regarding Bragg's safety training.

At the final status conference on August 16, 2021, the parties argued about whether Bragg had any duty to train as an employer under OSHA and *Privette.* The court denied Bragg's motions, finding that this was an issue for the jury.

Turning to plaintiffs' motion, the court told plaintiffs' counsel, "If you want to call Bragg an employer during this trial, that is going to present a problem." The court also asked how Bragg could be called an employer, for purposes of "OSHA or otherwise . . . when the court has ruled that they are not an employer." Plaintiffs' counsel agreed that Bragg was "not an employer for workers' comp." In response to the court's query why plaintiffs "need to tell this jury that [Bragg was] an employer of [Kirk]," plaintiffs' counsel stated, "Because as the entity that puts on all safety training, announces safety rules...they were de facto an employer under OSHA law." He further explained that plaintiffs' expert would testify that because Bragg took on the obligation for safety training, it was required to do that training consistent with OSHA regulations.

The court then asked if the expert "tells the jury the OSHA regulations apply to them in this context, why do you have to use the term 'employer'?" Plaintiffs' counsel responded, "I don't." The court noted that it would be "kind of confusing if you start using the word 'employer.'" Plaintiffs' counsel agreed, stating "I see your point. I won't use the word 'employer.'"

In support of plaintiffs' motion in limine, plaintiffs' counsel argued that Bragg should not be allowed to present evidence of a lesser standard than OSHA, citing *Elsner v. Uveges* (2004) 34 Cal.4th 915, 935–936 (*Elsner*). The court denied plaintiffs' motion, finding that under *Elsner*, "the OSHA standards may be used to argue the nature of the defendant's duty of care in negligence or wrongful death actions. It is not the end all, be all."

Both parties also submitted proposed jury instructions on the first day of trial.[14]  Plaintiffs submitted a modified version of CACI No. 418, presumption of negligence per se.[15]  The proposed instruction read as follows, with errors in original:[16]

"(a) California Occupational Health and Safety Administration regulations, under Regulation, Title 8 California Code of Regulation, 3202(a)(4), requires that the employer have procedures for and set out identifying and evaluate workplace hazard to identify unsafe working conditions and practices.

"(b) California Occupational Health and Safety Administration regulations. under Regulation, Title 8 California Code of Regulation, 3202(a)(7), requires that after evaluation of the workplace hazards the employer have procedures to eliminate and train to eliminate such identified workplace hazards.

"(c) California Occupational Health and Safety Administration regulations under Regulation, Title 8 California Code of

---

[14]     Indeed, the court admonished the parties that they were supposed to provide the jury instructions to the court at the final status conference, but only submitted them as trial was starting.

[15]     "Under the doctrine of negligence per se, the plaintiff 'borrows' statutes to prove duty of care and standard of care.  [Citation.]  The plaintiff still has the burden of proving causation." (*Johnson v. Honeywell Intern. Inc.* (2009) 179 Cal.App.4th 549, 558; see also Evid. Code § 669.)

[16]     The form version of CACI No. 418 provides: [Insert citation to statute, regulation, or ordinance] states: If [name of plaintiff/defendant] proves 1. That [name of defendant/plaintiff] violated this law and 2. That the violation was a substantial factor in bringing about the harm, then you must find that [name of defendant/plaintiff] was negligent [unless you also find that the violation was excused].  If you find that [name of defendant/plaintiff] did not violate this law or that the violation was not a substantial factor in bringing about the harm [or if you find the violation was excused], then you must still decide whether [name of defendant/plaintiff] was negligent in light of the other instructions.

27

Regulation, 3314(d), that the employer have procedures for lock out and tag out of equipment as it is being worked on.

"If you decide

1. That [Bragg] claim violated this law and

2. That the violation was a substantial factor in bringing about the harm, then you must find that [Bragg] was negligent. If you find that [Bragg] claim did not violate this law or that the violation was not a substantial factor in bringing about the harm, then you must still decide whether [Bragg] claim was negligent in light of the other instructions."

Plaintiffs also submitted proposed special instructions number 2 through 20, related to OSHA standards and the duty of care.[17] For example, requested special instruction number 3 stated, "Every company shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful for all employees, even those who are not their direct employee. Every company shall do every other thing reasonably necessary to protect the life, safety, and health of employees, even if the employee is not their employee." In support of this instruction (and many of the others) plaintiffs cited Labor Code section 6401, Evidence Code section 669, *Elsner, supra*, 34 Cal.4th 925, and *Taulbee v. EJ Distribution Corp*. (2019) 35 Cal.App.5th 590 (*Taulbee*). Several other requested instructions also involved the requirement to furnish "safety devices and safeguards" and use adequate safety processes under Labor Code sections 6401 (instruction numbers 12 and 13) and 6403 (instruction number 9).

Requested special instruction number 4 stated, "Every company shall establish, implement, and maintain an effective injury prevention program," and then listed the elements required for such a program. Requested instruction numbers 4 through 7 also involved the requirements of an injury prevention program under Labor Code, section 6401.7. Plaintiffs also requested instructions reflecting the OSHA requirement to furnish a "safe

---

[17] Plaintiffs do not assert any claim of error regarding their proposed special instruction number 1.

and healthful" place of employment (instruction numbers 8, 10, and 11), variations on the negligence per se instruction (instruction numbers 14 through 19), and an instruction on the duties of a hirer under *Hooker* (instruction number 20).[18] Additionally, requested special instruction number 2 stated, "A company covered by these rules set out below is not just the direct employer of the injured worker but includes multiple other company [*sic*]. Every company who affects the working conditions is responsible for safety in the working environment as an employer." The instruction then defined "responsible employer" according to four "employer types."[19]

Bragg objected to plaintiffs' proposed instructions on the grounds of "vague and ambiguous and relevance." Bragg also filed several individual briefs with further objections to certain instructions, including the modified CACI No. 418 and the proposed special instructions.

The court issued a written ruling denying plaintiffs' proposed special jury instructions on August 24, 2021. In denying instruction number 3, for example, the court found that "[t]he language in the instruction 'even those who are not their direct employee' suggests the section applies to all employees and non-employees alike. None of the authorities cited by plaintiff stand for this proposition." The court also denied a number of the instructions on the ground that they did not accurately reflect the corresponding Labor Code sections.

During a break in the trial on August 24, the court noted that it was struggling with the applicability of CACI No. 418, the negligence per se instruction, versus CACI No. 1009B, setting forth liability for negligent exercise of retained control. As the parties continued to discuss the issue, the court stated that the discussion was taking too long, and it needed to bring the jury back in. The court also admonished both parties about their

---

[18]     Plaintiffs also requested CACI 1009B, liability of employees of independent contractors for unsafe conditions – retained control. The court ultimately gave a modified version of this instruction.

[19]     These four "types" are derived from Labor Code section 6400, subdivision (b), which sets forth categories of employers on "multiemployer worksites" who may be cited "when the division has evidence that an employee was exposed to a hazard." (Lab. Code, § 6400, subd. (b).) Plaintiffs' instruction did not contain these other specifications set forth in the statute.

disorganization and failure to timely give the court proper proposed instructions, noting, "I rarely have a problem this bad."

Later that afternoon, after the parties rested, counsel continued to discuss jury instructions with the court. Plaintiffs' counsel asked whether the court would "entertain any kind of additional proposed instructions as it relates to OSHA?" The court chided counsel to focus on the instructions before them. At the end of the afternoon, plaintiffs' counsel again asked whether the court would consider additional OSHA instructions the following morning. The court responded, "Sir, I gave you rulings on your 20 special instructions. Tomorrow we have to get through this. . . . If you want to bring all of those, and we have time before the jury gets here at 9:30, sure."

The next morning, August 25, 2021, the parties argued Bragg's motion for directed verdict and then continued to discuss jury instructions. The court ruled that it would not instruct with CACI No. 418, negligence per se. Plaintiffs' counsel objected, stating that "we have proceeded on the notion that there are three statutes that apply establishing basic duty of care found in the OSHA regulations as set out by the CACIs that we cited, so we are requesting at least negligence per se." The court responded that plaintiffs "haven't provided the court with a proper jury instruction as to what that statute is, and therefore I cannot give that instruction." Plaintiffs' counsel noted that he had provided special instructions on that issue, but the court stated it had "refused them all, and I gave you specific reasons why." There is no evidence in the record that plaintiffs provided any revised proposed instructions. The court then concluded the discussion regarding instructions and trial resumed.

The court instructed the jury on the standard of care for negligence under CACI No. 401. The court also gave a modified version of CACI No. 1009B that Bragg was liable if plaintiffs established that Bragg had negligently exercised retained control over safety conditions. The jury found that Bragg was liable on a special verdict form echoing the language of CACI No. 1009B.

As they do on appeal, plaintiffs contended in their motion for new trial that they were prejudiced by the exclusion of their proposed jury instructions setting OSHA regulations as the standard of care. The court rejected this

argument, finding that it had excluded plaintiffs' proposed special instructions because they did not adequately reflect the relevant Labor Code sections.  The court also noted that it was counsel's "responsibility to provide the court with jury instructions which the court may read to the jury," and that the instructions must be complete.  However, despite the court's "detailed written ruling" setting forth the bases for denying the instructions, "plaintiffs failed to provide the court with adequate jury instructions on the OSHA issues."  The court found any error was not prejudicial. Plaintiffs contended that giving the proposed OSHA instructions would likely have resulted in the jury attributing a larger percentage of fault to Bragg.  The court found this argument was "both speculative and incongruent."

### 2.      *Legal standards*

On request, a party is entitled to correct instructions on each legal theory supported by substantial evidence.  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.)  "'A court may refuse a proposed instruction that incorrectly states the law'" or "'if other instructions given adequately cover the legal point. [Citation.]'"  (*Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 80.)

We review de novo the trial court's denial of a requested jury instruction.  (*Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1373.) "In doing so, and in evaluating any prejudicial impact of the excluded instruction, we view the evidence in the light most favorable to the losing party because 'we must assume the jury might have believed the evidence upon which the proposed instruction was predicated and might have rendered a verdict in favor of the losing party had a proper instruction been given.'" (*Taulbee v. EJ Distribution Corp.*, *supra*, 35 Cal.App.5th at p. 596, quoting *Bourgi v. West Covina Motors, Inc.* (2008) 166 Cal.App.4th 1649, 1664.)

### 3.      *Plaintiffs' claims of error*

Plaintiffs contend the court erred in denying their motion in limine to exclude Bragg's evidence of any lesser safety standards, their proposed special jury instructions numbers 2 through 20, and their request to instruct the jury on negligence per se with their modified version of CACI no. 418.  We examine each in turn.

We find no error in the trial court's denial of plaintiffs' motion in limine number 2. The parties disagreed as to whether Bragg was an "employer" and whether various OSHA regulations applied. The court found it was a factual determination for the jury. Plaintiffs have not shown how this was error.

Plaintiffs' reliance on *Elsner* is misplaced. In *Elsner, supra*, 34 Cal.4th at p. 924, a roofing subcontractor's employee sued the general contractor after he was injured by falling off scaffolding supplied by the general contractor. The Supreme Court held that "plaintiffs may use Cal–OSHA provisions to show a duty or standard of care to the same extent as any other regulation or statute, whether the defendant is their employer or a third party." (*Id*. at pp. 935–936.) The *Elsner* court also noted the established rule that "evidence of custom and practice may not be used to contravene a statutory duty of care." (*Id*. at pp. 939-940.) Here, plaintiffs were allowed to, and did, put on evidence that Bragg was subject to OSHA standards and did not meet them. Most of Bragg's witnesses also agreed that Bragg and HT were generally subject to OSHA regulations, but disagreed as to the applicability of specific regulations such as lockout/tag out. Bragg did not, contrary to plaintiffs' claim, put on evidence of compliance with lesser standards based on industry custom and practice as to safety training or safety protocols. Indeed, plaintiffs' expert testified that Bragg's written safety materials complied with OSHA, but their employee training did not. Thus, the court was not required under *Elsner* to exclude Bragg's evidence.

With respect to plaintiffs' proposed special instructions, we note as an initial matter that a number of the jury instructions were not relevant to the evidence at trial. As discussed above, plaintiffs argued Bragg could be liable pursuant to the *McKown* rule, which imposes a duty on a hirer that negligently provided unsafe equipment resulting in injury to the employee of an independent contractor. (*McKown, supra*, 27 Cal.4th at p. 225.) But plaintiffs' evidence did not support this theory, as they did not establish that Kirk's injuries were caused by the trailer's flat tire, by any unsafe conditions of the vehicle itself, or by a failure to provide a safety device to HT employees.

We note that *Elsner* involved a case of provision of faulty equipment. (See *Elsner, supra*, 34 Cal.4th at p. 924.) Thus, the fact that the trial court approved certain OSHA instructions as relevant to the claims in that case

does not require the same results in this one.  Thus, plaintiffs' proposed instructions related to provision of unsafe equipment or failure to provide safety equipment, including numbers 3, 9, 12, and 13, were not relevant and were properly rejected.

We also find no error in the trial court's rejection of most of the proposed special instructions because of the use of the term "any company" instead of "employer" and the addition of language such as "even if the employee is not their employee."  This language did not mirror the statutory language on which it was purportedly based and would likely have confused the jury.  Plaintiffs assert they made this change based on their earlier discussion with the court, but they ignore several salient facts.  First, the court told plaintiffs to avoid referring to Bragg as the employer in the context of a broader discussion of pre-trial issues, including expert testimony.  The court never instructed plaintiffs to use "any company" instead of "employer" in the jury instructions.  Moreover, plaintiffs did not object or seek to further discuss the issue with respect to their proposed jury instructions and their contention that Bragg was an "employer" under these instructions.  Second, it was plaintiffs' choice to use the vague term "any company."  Third, the court did not reject entirely plaintiffs' request for OSHA instructions.  It simply rejected as inadequate and inaccurate the only proposal plaintiffs made.  Plaintiffs never submitted a revised set of instructions and to the extent they ran out of time to do so, that was a problem of their own making.[20]

Apart from these issues, plaintiffs have not established how their proposed instructions were proper or how the court erred in denying them.  They ignore other aspects of the court's ruling, including that plaintiffs cited to nonexistent sections, 8 CCR 3202, subdivisions (a)(4) and (a)(7, that the proposed instruction setting forth lockout/tag out requirements under 8 CCR

---

[20]    At oral argument, plaintiffs' counsel asserted that he had submitted proposed jury instructions several weeks in advance of the final status conference.  He made no such assertion in plaintiffs' briefs nor any citation to the record, and we are aware of no support in the record for this statement.  To the contrary, plaintiffs' counsel previously stated that he had drafted the proposed instructions *in response* to the colloquy with the court regarding using the term "employer," which occurred at the final status conference on August 16, 2021.

3314, subdivision (d) did not accurately set forth the law under that regulation and that certain proposed instructions were unhelpful and misleading. Plaintiffs also ignore the fact that the court did not deny special instruction number 20, setting forth requirements for negligent retained control, but stated that "Some version of CACI 1009 should instruct the jury on this issue."

In sum, the special instructions plaintiffs proposed were unnecessarily voluminous, repetitive in parts, often irrelevant, and unclear. It was not error for the court to reject them. Moreover, plaintiffs' suggestion that the court was "not interested" in discussing the jury instructions further is meritless. It is evident from the record that the court spent a great deal of time and effort discussing the jury instructions with the parties, reviewing their submissions, and reading the relevant case law as to complex issues of negligence, all despite the parties' frequently untimely and inadequate submissions and the demands of an ongoing trial. The court issued a written order explaining its reasoning for denying plaintiffs' numerous proposed instructions and then indicated it would be willing to consider revised instructions if plaintiffs submitted them. Plaintiffs never did so. Whether or not they were entitled to a proper OSHA instruction, they have not established that they provided one. Plaintiffs therefore have not demonstrated error.

Similarly, with respect to CACI No. 418, plaintiffs ignore the ways in which their proposed instruction deviated from the form. Plaintiffs' proposed instruction was riddled with errors and citations to regulation sections that do not exist. It also continued to inaccurately describe the lockout/tag out requirements of 8 CCR 3314, subdivision (d). The court did not err in rejecting this instruction.

### 4. *Prejudice*

Even assuming the court erred, we must also determine whether the error was harmless. "We will not reverse a judgment unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.'" *Elsner, supra*, 34 Cal.4th at p. 939, quoting Cal. Const., art. VI, § 13.) For civil state law error, such as an erroneous refusal to instruct the jury, "this standard is met when 'there is a reasonable

probability that in the absence of the error, a result more favorable to the appealing party would have been reached.'" (*Elsner, supra*, 34 Cal.4th at p. 939, quoting *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 574.)

Plaintiffs argue that because of the court's errors, the jury "was instructed about the reasonable man standard, with no reference to the duty by an employer or company to make the work environment safe." They contend that with proper instruction regarding the standard of care under OSHA, the jury would likely have assessed a higher percentage of fault to Bragg. We disagree with plaintiffs on both grounds.

First, the court did not, as plaintiffs suggest, simply instruct the jury with a standard negligence instruction. Instead, the court read a modified version of CACI No. 1009B, an instruction requested by plaintiffs and also echoed in several of their proposed special instructions. With that instruction, the jury was told that to establish Bragg's liability for retained control over unsafe conditions, plaintiffs had to prove the following elements: (1) Bragg "controlled the worksite"; (2) Bragg "retained control over safety conditions at the place of the accident"; (3) Bragg negligently exercised that control "by failing to provide proper training to Leroy Proctor and/or Kirk Hollingsworth to complete the job"; (4) plaintiffs were harmed; and (5) Bragg's negligent exercise of its "retained control over safety conditions was a substantial factor" in causing plaintiffs' harm.

In other words, the jury was instructed that the duty plaintiffs claimed Bragg breached—the failure to provide proper safety training, including immobilizing a vehicle before working on it—could be a basis for liability against Bragg. The court also allowed plaintiffs to present evidence of how that duty could be linked to OSHA requirements. Indeed, the jury found that Bragg breached this duty.

Moreover, plaintiffs have not shown it is reasonably likely that additional jury instructions would have led to a more favorable result for them. The proposed instructions sought to establish that Bragg had a duty to Kirk and that it breached that duty by failing to comply with OSHA regulations. The jury found in plaintiffs' favor based on the alleged negligent training by Bragg. Plaintiffs have not shown how the inclusion of instructions on OSHA requirements would have altered the jury's apportionment of fault.

Plaintiffs were not the "losing party" on the elements relevant to the OSHA instructions and therefore cannot establish prejudice. (See, e.g., *Taulbee, supra*, 35 Cal.App.5th at p. 596.)

### C. Damages Award

#### 1. *Amount of award*

Plaintiffs moved for a new trial based on "inadequate damages" pursuant to section 657, subdivision (5). Plaintiffs argued that the amount of damages awarded by the jury was inadequate and not supported by the evidence. The trial court denied the motion. Plaintiffs now raise the same challenge to the damages award on appeal. We find no error in the trial court's denial of plaintiffs' motion for new trial.

A trial court may grant a new trial for inadequate damages only if, "after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (§ 657.) On appeal, we "can reverse the denial of a new trial motion based on insufficiency of the evidence or [inadequate or] excessive damages only if there is no substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1415-1416; *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412.)

At trial, plaintiffs' economic expert valued the total economic loss from Kirk's death at approximately $1.4 million, including $357,433 in past lost wages, insurance, and household services, and over $1 million in future economic loss. The expert was subject to cross-examination by Bragg's counsel; Bragg did not present any competing expert testimony.

The jury was instructed with CACI No. 219, as requested by plaintiffs, that "[y]ou do not have to accept an expert's opinion" and "[y]ou may believe all, part, or none of an expert's testimony." The jury was also instructed with CACI No. 3921 that if it found Bragg was liable, it had to determine "how much money will reasonably compensate" plaintiffs for Kirk's death. That instruction explained that plaintiffs' claimed economic damages included the financial support Kirk would have contributed to the family during his life expectancy, the loss of gifts or benefits plaintiffs would have expected to receive from Kirk, and the reasonable value of household services Kirk would

have provided.  As for noneconomic damages, plaintiffs sought compensation for the loss of Kirk's "love, companionship, comfort, care, assistance, protection, affection, society, moral support," loss of enjoyment of sexual relationships between Kirk and Leanne, and loss of Mark's training and guidance by Kirk.

The jury awarded Leanne past economic damages of $301,000, future economic damages of $552,000, and $135,000 for loss of companionship.  The jury awarded Mark past economic damages of $5,000, future economic damages of $22,000, and $27,000 for loss of companionship.  In denying plaintiffs' motion for new trial, the court rejected plaintiffs' challenge to the damages awarded, finding that the jury did not have to base its award on the testimony by plaintiffs' expert.

Plaintiffs contend that the jury lacked evidence to award less than the amount calculated by their expert.  They argue that there was no conflicting evidence regarding damages and thus the jury had "no basis" to discount Leanne's economic damages by 39 percent of her claim or to award Mark only $1,000 per year for loss of companionship.  We find no abuse of discretion in the trial court's conclusion.  Although plaintiffs contend the jury had "no reason to distrust" their expert's testimony, the jury was not required to accept plaintiffs' expert's testimony wholesale and was properly instructed on the bases for each category of damages.  Moreover, the jury awarded plaintiffs almost all of their requested past economic damages, for which there was no conflicting evidence.  As such, this case is distinct from those cited by plaintiffs, where the court overturned a damages award as clearly unsupported by the evidence.  For example, in *Clifford v. Ruocco* (1952) 39 Cal.2d 327, 329, our Supreme Court found the $1,500 award of damages grossly inadequate to compensate the plaintiff for her serious injuries resulting from a car accident.  The court noted that the uncontradicted evidence showed that the plaintiff's medical expenses and lost earnings exceeded $2,000 and she also presented evidence of a considerable amount of ongoing pain and discomfort resulting from her injuries.  (*Ibid*.)  We therefore do not find that the evidence compels a conclusion that the damages award was inadequate.

## 2. *Exclusion of evidence regarding loss of affection*

Plaintiffs argue that the court improperly excluded testimony by "Leanne's physician and others" relevant to plaintiffs' loss of love, society, and affection. They contend that this exclusion denied them a fair trial and therefore they are entitled to a new trial pursuant to section 657, subdivision (1). Plaintiffs have not established error.

### a. *Scope of damages in wrongful death claim*

A plaintiff in a wrongful death action is entitled to recover damages for his or her pecuniary loss, "'which may include (1) the loss of the decedent's financial support, services, training and advice, and (2) the pecuniary value of the decedent's society and companionship.'" (*Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 489 (*Fernandez*), citing *Nelson v. County of Los Angeles* (2003) 113 Cal.App.4th 783, 793.) "'Factors relevant when assessing a claimed loss of society, comfort, and affection may include the closeness of the family unit, the depth of their love and affection, and the character of the deceased as kind, attentive, and loving.'" (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 721.)

"However, the plaintiff may not recover for the grief or sorrow attendant upon the death of a loved one, or for his or her sad emotions and for the sentimental value of the loss." (*Fernandez, supra*, 40 Cal.App.5th 489; see also *Krouse v. Graham* (1977) 19 Cal.3d 59, 72 ["damages for mental and emotional distress, including grief and sorrow, are not recoverable in a wrongful death action"].) This is so because "emotional injuries to the heirs are not relevant to a cause of action for wrongful death. 'Rather, the measure of damages [in a wrongful death action] is the value of the benefits the heirs could reasonably expect to receive from the deceased if [he or] she had lived.' [Citations.]" (*Canavin v. Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 520.)

### b. *Factual background*

As a procedural matter, plaintiffs contend the trial court improperly granted Bragg's motion in limine to exclude the evidence at issue. But there is no evidence in the record of any such motion by Bragg. Instead, the issue was raised by the court during a pre-trial discussion of the parties' witnesses. The court asked plaintiffs about the scope of proposed testimony by Larry,

Kirk's father. Plaintiffs' counsel responded that Larry was going to "talk about the emotional impact on the family to both Leanne and Mark Hollingsworth that he's observed." Upon further questioning by the court, plaintiffs' counsel explained that this meant the "loss of love, society, affection. . . . [¶] That [Larry] has been with [Leanne and Mark] weekly, monthly, repeatedly at family functions, et cetera, and they are still a mess. They are not doing well." The court stated, "So that's a problem, right? I would invite – I mean, it would be fine for him to talk about their past relationship, right? 'Yeah, I saw my son with my grandson, and they played ball together. They did this together; they did that together.' That would show the jury what their relationship was like before that. [¶] To say that they're still a mess, right, you get into grief, and there's no compensation for grief, right?" Plaintiffs' counsel indicated that he understood the difference.

A few moments later, the court asked about the proposed testimony by Dr. Robert Martin, Leanne's treating physician who prescribed her medication for several years following Kirk's death. Plaintiffs' counsel again stated that Martin's testimony was relevant to "[l]oss of love, society and affection." The court responded that plaintiffs were entitled to compensation for the loss of "someone in your life that was very important to you. . . . I don't believe you get compensation for the effect it has on you." Plaintiffs' counsel agreed that "grief is not compensable, but to demonstrate the significance of the impact of the loss of love, society and affection, the loss of that person, there's got to be something that you can say, 'this person is different for her loss from this person here.'" The court agreed, but reiterated that "the jury bases that on what their relationship was before the death…. [¶] I'll listen to argument on that, but I've never seen a wrongful death case where someone gets emotional distress damages." The court concluded that plaintiffs could not present testimony by Martin regarding Leanne's treatment, explaining, "the jury is going to be able to understand based on what I assume is going to be extraordinarily emotional testimony on what kind of husband and father he was, right? And then the jury will understand."

Using CACI No. 3921, the court instructed the jury that it could not consider plaintiffs' "grief, sorrow, or mental anguish," as part of the

39

determination of plaintiffs' damages. The same instruction listed the types of loss that the jury *could* consider in determining plaintiffs' noneconomic damages. In denying plaintiffs' motion for new trial, the court found it properly excluded evidence of plaintiffs' grief and sorrow, as those items were not recoverable in a wrongful death action.

### c. *Analysis*

Plaintiffs acknowledge that evidence of grief was not admissible. But they argue that they should have been able to submit evidence of how the loss of Kirk's love and affection "manifested itself" after his death. The testimony excluded by the court—Larry's observations that plaintiffs "were not doing well" after Kirk's death and testimony by Leanne's doctor that she was taking medication—relates to plaintiffs' grief and sorrow. Plaintiffs have cited to no authority supporting the admission of similar evidence for a wrongful death claim.

Moreover, to the extent plaintiffs contend they could have offered other testimony about their "unique" post-accident experience that was separate from grief, they made no offer of proof as to that testimony and did not seek to admit it at trial. Plaintiffs contend that they did not testify about "post death feelings for loss of love and affection" in compliance with the trial court's ruling. But notably the court did not exclude any testimony by either plaintiff; the court's discussion and rulings were focused on two other witnesses and plaintiffs' counsel did not address any proposed testimony by plaintiffs. Similarly, although plaintiffs contend the court excluded "an entire class of evidence," the record does not support this contention. We also note that the court stated several times that it would entertain argument on this issue, but plaintiffs' counsel responded that he understood the distinction the court had made and offered no further argument or authority. Plaintiffs have therefore forfeited this point by failing to properly raise it below. (See *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1113 ["A judgment cannot be set aside on the ground that the court erroneously excluded evidence unless the substance, purpose and relevance of the excluded evidence were made known to the court by an offer of proof or by other means."]; see also Evid. Code, § 354, subd. (a).)

Additionally, we reject plaintiffs' contention that they were not permitted to introduce evidence of their experience of the loss of love and affection from Kirk.  Both plaintiffs, as well as Kirk's father Larry, testified at length regarding their loving relationship with Kirk and the close bond they shared as a family.  In contrast, the evidence excluded by the court regarding the impact that Kirk's death had on plaintiffs was relevant to grief and therefore properly excluded.

### D.    Judge's Conduct

Plaintiffs also contend that the trial court engaged in improper conduct during trial, including "gestures and movements, expressions, and eye rolling," which "made it difficult for either plaintiff to have a neutral and detached trial free of hostility."  Plaintiffs fail to establish any misconduct.

#### 1.    *Background*

Plaintiffs moved for a new trial on the ground of "[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial." (§ 657, subd. (1).)  They contended that the trial judge demonstrated "repetitive hostility . . . most often at Plaintiffs' attorney."  They claimed that the conduct was "so bad that at one point a juror had to leave because she could not take it."

In support of their motion, plaintiffs filed the declaration of the audio-visual assistant who handled plaintiffs' video evidence during trial.  He stated that the conduct of the judge "shocked me and alarmed my sense of fair play."  Specifically, the assistant observed the judge "regularly roll[ ] his eyes during the presentation of testimony," and on "many other occasions shake his head, sometimes in his hand, as in disbelief, almost all of the time during the plaintiffs' presentations."  In addition, he stated that he regularly heard the judge make hostile comments toward plaintiffs' counsel, and on a few occasions toward Bragg's counsel.  Each day during trial, he observed the judge "yelling at and or demeaning counsel, sometime in front of the jury and sometimes in their absence."

Plaintiffs also presented a declaration from Francis Diaz, one of their trial attorneys.  Diaz stated that she observed the judge making repeated comments that were "hostile, caustic, demeaning, and inappropriate" often

toward plaintiffs' counsel and on occasion toward Bragg's counsel. She also she saw the judge roll his eyes and "on dozens of occasions, he would put his head forward into his hands and just shake his head . . . as in disbelief at certain testimony offered by the plaintiffs." She opined that this conduct was noticed by the jurors.

In opposition to the motion for new trial, Bragg noted that its trial counsel did not see any of the misconduct alleged by plaintiffs. Bragg's counsel acknowledged that the trial judge "runs a tight ship" but believed that the court's expectations and rules were applied equally to both parties.

In its written order denying the motion, the court noted that "no trial transcripts were made available to the court" to support plaintiffs' claims. While acknowledging it was "difficult to judge one's own conduct," the court denied engaging in any of the alleged conduct. The court also noted that it wore a facial mask during the trial in accordance with the COVID mask mandates and that the view of the judge from the jury box was partially obstructed by computer monitors. In addition, the court relied on the testimony by both of Bragg's attorneys that they had not witnessed any improper behavior, and noted that plaintiffs were successful on the issue of liability. The court also recalled that the juror who left did so because she stated that the conflict of the trial triggered her post-traumatic stress disorder, not because of the court's conduct.

### 2.    *Analysis*

Plaintiffs contend that their trial was unfair due to improper comments and bodily gestures by the trial judge. As an initial matter, in their opening appellate brief, as in their briefing below, plaintiffs provided no reference or citation to any portion of the trial transcript. They therefore failed to identify any specific comments or statements by the judge that were purportedly improper. Plaintiffs belatedly included several pages of quotes from the trial in their reply on appeal, purporting to "aid in the review and respond to [Bragg's] claim of lack of evidence."

Plaintiffs have forfeited their right to rely on this evidence by failing to present it to the trial court or in their opening brief on appeal. ( See, e.g., *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537 [new evidence not permitted with reply]; *Nick v. City of Lake Forest* (2014) 232 Cal.App.4th 871, 879

[arguments raised for the first time in appellate reply brief are forfeited absent good cause].)  By waiting until their reply brief to identify any judicial statements they claim were improper, plaintiffs have denied Bragg the opportunity to respond.  (See, e.g., *American Drug Stores v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument."].)

Accordingly, plaintiffs have failed to support their claim of improper commentary by the court with any evidence of such statements.  Moreover, even if we were to consider the evidence cited in reply, the citations are inadequate.  Plaintiffs merely quote portions of discussions between counsel and the court, but fail to identify any specific statements they claim were improper, or articulate the basis for such a claim.[21]

Plaintiffs' claim that a juror left because she was upset by the court's behavior is similarly lacking in evidence.  On the second day of trial, at the start of Bragg's cross-examination of plaintiffs' expert Smart, who was testifying by video, the court admonished plaintiffs' counsel for providing the witness with a copy of only plaintiffs' exhibits.  The court dismissed the witness and noted that at the break it would entertain a motion to strike Smart's testimony.  The trial resumed with another witness.  During the next break, the court stated it had received the following note from juror number six: "Navy veteran service-connected disability anxiety/depression. I just had a panic attack while everyone was arguing.  I still feel a pain in my chest, and at the moment I have a crying spell.  I don't feel well.  Don't know if I can continue."  The court spoke to the juror, apologizing for the arguing but explaining that "it's kind of the nature of what happens in a courtroom."  The court inquired whether the juror could continue to serve and she responded, "when you guys started arguing, and I know it's part of the trial process, I just had this really bad pain in my chest."  The court stated it would excuse the juror to protect her mental health.

---

[21]    We also note that of the portions of the transcript cited in reply, all involve discussions occurring outside of the jury's presence and thus cannot support the claim that the jury was improperly influenced.

Plaintiffs' assertion that the juror "was affected by the level of [the court's] hostility" is not supported by the record. The juror did not identify any hostility or anger by the court as the cause of her panic attack, but stated it occurred after an argument between plaintiffs' counsel and the court over counsel's failure to provide the necessary exhibits to the witness. Moreover, plaintiffs cite to no authority suggesting that one juror becoming upset about court proceedings is a sufficient basis to order a new trial.

Finally, plaintiffs fail to establish any prejudicial misconduct based on their claim that the court engaged in eye-rolling, head shaking, and other negative bodily gestures during trial. Both the trial court and Bragg's counsel denied the occurrence of such conduct. Notably, plaintiffs did not raise any objection during trial and therefore forfeited these claims of judicial misconduct. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1320 ["As a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review"]; *People v. McWhorter* (2009) 47 Cal.4th 318, 373 [claim forfeited where the defendant failed to object or seek a jury admonition regarding alleged judicial misconduct].) But even if we credited plaintiffs' evidence, it demonstrated that the court engaged in these behaviors toward both parties. Thus, plaintiffs' evidence could not establish that the court favored Bragg so as to render the trial unfair.

We therefore find no error in the court's denial of plaintiffs' new trial motion on the basis of judicial misconduct.

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


ZUKIN, P. J.                                         MORI, J.

44